ORAL ARGUMENT NOT YET SCHEDULED

**No. 12-5366**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

ADIRONDACK MEDICAL CENTER, ET AL.,

*Appellants,*

v.

KATHLEEN SEBELIUS, IN HER OFFICIAL CAPACITY
AS SECRETARY OF THE UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES,

*Appellee.*

———————————

*On Appeal from the United States District Court
for the District of Columbia*

———————————

**APPELLANTS' CORRECTED BRIEF**

Ankur J. Goel
M. Miller Baker
Johnny H. Walker
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, DC 20001
Telephone:  202.756.8000
Facsimile:   202.756.8087

*Attorneys for Appellants*

## THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**ADIRONDACK MEDICAL CENTER**, et al.,

        Appellants,

   v.

**KATHLEEN SEBELIUS**, in her official capacity as Secretary of the United States Department of Health and Human Services,

        Appellee.

No. 12-5366

## APPELLANTS' CERTIFICATE AS TO
## PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), Appellants certify as follows:

**(A)    Parties and Amici.** The following parties appeared before the district court. (There were no amici or intervenors before the district court, and there are none before this Court.)

**Plaintiffs:** The following 137 hospitals were plaintiffs before the district court. There are no parent companies or publicly-held companies with a 10% or greater ownership interest in any of these hospitals.

     1.     Adirondack Medical Center

     2.     Alice Hyde Medical Center

     3.     Ashtabula County Medical Center

4.     Audrain Health Care, Inc.
       d/b/a Audrain Medical Center

5.     Aurelia Osborn Fox Memorial Hospital
       d/b/a A.O. Fox Memorial Hospital

6.     Baptist Health Hospitals
       d/b/a Baptist Medical Center Stuttgart

7.     Baptist Memorial Hospital-Booneville, Inc.

8.     Bassett Hospital of Schoharie County
       d/b/a Cobleskill Regional Hospital

9.     Bay Area Hospital District
       d/b/a Bay Area Hospital

10.    Benefis Hospitals, Inc.

11.    Blessing Hospital

12.    Bothwell Regional Health Center

13.    Campbell County Memorial Hospital

14.    Cape Cod Healthcare Inc.
       d/b/a Cape Cod Hospital

15.    Captial Region Medical Center

16.    CarolinaEast Medical Center
       d/b/a CarolinaEast Health System

17.    Catskill Regional Medical Center

18.    CGH Medical Center

19.    Champlain Valley Physicians Hospital

20.    Chesapeake Hospital Corporation
       d/b/a Rappahannock General Hospital

21.    Cheshire Medical Center

22.  Chippewa County War Memorial Hospital, Inc.
     d/b/a War Memorial Hospital

23.  Citizens Memorial Hospital District
     d/b/a Citizens Memorial Hospital

24.  Clallam County Public Hospital District 2
     d/b/a Olympic Medical Center

25.  Clarion Hospital

26.  Coffey County Hospital

27.  Community Memorial Health Center

28.  Corning Hospital

29.  Cortland Regional Medical Center, Inc.

30.  Davis Memorial Hospital

31.  Essent Healthcare—Waynesburg LLC
     d/b/a Southwest Regional Medical Center

32.  Essent Healthcare of Connecticut, Inc.
     d/b/a Sharon Hospital

33.  Flagstaff Medical Center

34.  Freeport Memorial Hospital
     d/b/a FHN-Memorial Hospital

35.  Fremont Area Medical Center

36.  Golden Valley Memorial Hospital District

37.  Grenada Lake Medical Center

38.  Hannibal Regional Hospital

39.  Harrisburg Medical Center Inc.

40.  Hays Medical Center Inc.

41.  Heartland Regional Medical Center

42. IHC Health Services, Inc.
    d/b/a Dixie Regional Medical Center

43. Illinois Valley Community Hospital

44. Indiana Regional Medical Center

45. Jackson County Memorial Hospital Authority
    d/b/a Jackson County Memorial Hospital

46. Jefferson Hospital Association Inc.
    d/b/a Jefferson Regional Medical Center

47. John Tolfree Health System Corporation
    d/b/a West Branch Regional Medical Center

48. Keokuk Area Hospital

49. King's Daughters Medical Center

50. Knox Community Hospital

51. La Paz Regional Hospital, Inc.
    d/b/a La Paz Regional Hospital

52. Labette County Medical Center

53. Lake Regional Health System

54. Lawrence Memorial Hospital

55. Lewis County General Hospital

56. LRG Healthcare
    d/b/a Lakes Region General Hospital

57. Maine Coast Regional Health Facilities
    d/b/a Maine Coast Memorial Hospital

58. Marquette General Hospital, Inc.
    d/b/a Marquette General Health System

59. Mary Hitchcock Memorial Hospital

60. Mary Imogene Bassett Hospital
    d/b/a Bassett Healthcare

61. Mary Lanning Memorial Hospital

62. Mary Rutan Hospital

63. McDonough County Hospital District
    d/b/a McDonough District Hospital

64. Meadville Medical Center

65. Memorial Hospital, Inc.

66. Mercy Hospital of Tiffin, Ohio

67. MidMichigan Medical Center—Midland

68. Mile Bluff Medical Center Inc.
    d/b/a Hess Memorial Hospital

69. Miles Memorial Hospital

70. Montrose Memorial Hospital

71. Munson Medical Center

72. Nathan Littauer Hospital & Nursing Home

73. Newberry County Memorial Hospital

74. Newman Memorial County Hospital
    d/b/a Newman Regional Health

75. Northeast Arkansas Baptist Memorial Health Care, LLC
    d/b/a NEA Baptist Memorial Hospital

76. Northwestern Medical Center

77. Onslow Memorial Hospital, Inc.

78. Otero County Hospital Association
    d/b/a Gerald Champion Regional Medical Center

79. Ottumwa Regional Health Center Inc.

80.  Owensboro Medical Health System, Inc.

81.  Passavant Memorial Area Hospital Association
     d/b/a Passavant Area Hospital

82.  Penobscot Bay Medical Center

83.  Perry Memorial Hospital Authority
     d/b/a Perry Memorial Hospital

84.  Phelps County Regional Medical Center

85.  Pikeville Medical Center Inc.

86.  Pocatello Hospital, LLC
     d/b/a Portneuf Medical Center

87.  Pocono Medical Center

88.  Portage Health Inc.

89.  Promise Regional Medical Center-Hutchinson, Inc.

90.  Rapid City Regional Hospital Inc.

91.  Regional Health Network Inc.
     d/b/a Spearfish Regional Hospital

92.  Regional West Medical Center

93.  Reid Hospital & Health Care Services Inc.
     d/b/a Reid Hospital

94.  Rice Memorial Hospital

95.  Ridgecrest Regional Hospital

96.  Sacred Heart Health Services
     d/b/a Avera Sacred Heart Hospital

97.  Saint James Hospital

98.  Salina Regional Health Center, Inc.

99.  Sarah Bush Lincoln Health Center

100. Sid Peterson Memorial Hospital
d/b/a Peterson Regional Medical Center

101. Skiff Medical Center

102. Smyth County Community Hospital

103. Somerset Community Hospital
d/b/a Somerset Hospital

104. Sonora Community Hospital
d/b/a Sonora Regional Medical Center

105. Southeastern Ohio Regional Medical Center Inc.

106. Southeastern Regional Medical Center

107. Southern Illinois Hospital Services
d/b/a Herrin Hospital

108. Southern Monterey County Memorial Hospital
d/b/a George L. Mee Memorial Hospital

109. Southern Ohio Medical Center

110. Southwestern Vermont Medical Center Inc.

111. SSM Regional Health Services
d/b/a St. Francis Hospital & Health Services

112. St. Mary Medical Center

113. St. Mary's Hospital

114. St. Francis Hospital

115. St. Joseph's Medical Center

116. St. Margaret's Hospital

117. St. Mary's Hospital & Medical Center, Inc.

118. St. Mary's Hospital Streator Hospital

119. Stillwater Medical Center Authority
     d/b/a Stillwater Medical Center

120. Sutter Central Valley Hospitals
     d/b/a Memorial Hospital Los Banos

121. Sutter Coast Hospital

122. Sutter Health Sacramento Sierra Region
     d/b/a Sutter Amador Hospital

123. Tahlequah Hospital Authority
     d/b/a Tahlequah City Hospital

124. The Carbon-Schuylkill Community Hospital, Inc.
     d/b/a St. Luke's Miners Memorial Hospital

125. The Rutland Hospital, Inc.

126. The Trover Clinic Foundation, Incorporated
     d/b/a Regional Medical Center

127. Trinity Regional Medical Center

128. Twin County Regional Healthcare, Inc.

129. Unity Healthcare
     d/b/a Trinity Muscatine

130. Valley View Hospital Association

131. Van Wert County Hospital Association

132. Verde Valley Medical Center

133. Via Christi Hospital Pittsburg, Inc.
     d/b/a Mt. Carmel Regional Medical Center, Inc.

134. Wayne Memorial Hospital Inc.

135. Waynesboro Hospital

136. Winona Health Services
     d/b/a Winona Community Memorial Hospital

137.    Yampa Valley Medical Center

**Defendant:** There was only one defendant before the district court:

1.      Kathleen Sebelius, in her official capacity as
        Secretary of the United States Department of
        Health and Human Services

**Appellants:** All of the Plaintiffs listed above are also Appellants before this

Court *except* the following three:

2.      Sid Peterson Memorial Hospital
        d/b/a Peterson Regional Medical Center

3.      Via Christi Hospital Pittsburgh, Inc.
        d/b/a Mt. Carmel Regional Medical Center, Inc.

4.      Corning Hospital

**Appellees:** The only Appellee before this Court is the Defendant below:

1.      Kathleen Sebelius, in her official capacity as
        Secretary of the United States Department of
        Health and Human Services

**(B)    Rulings Under Review.** The ruling at issue in this court is the

September 17, 2012, Order by Judge Rosemary M. Collyer of the United States

District Court for the District of Columbia in the consolidated cases Nos. 1:11-cv-

01671-RMC and 1:12-cv-00457-RMC granting Defendant-Appellee's motion to

dismiss Plaintiffs-Appellants' pleadings in the consolidated actions and denying

Plaintiffs-Appellants' motion for summary judgment. That order is docket entry

number 25 in Case No. 1:11-cv-01671-RMC and number 6 in Case No. 1:12-cv-

00457-RMC. The associated opinion is docket entry number 24 in Case No. 1:11-

cv-01671-RMC and number 5 in Case No. 1:12-cv-00457-RMC. Appellants are not aware of any citation to an official publication.

**(C)** **Related Cases.** This case has not previously been before this Court or any other court other than the district court below. There are no cases involving substantially the same parties and the same or similar issues.

Dated:    December 20, 2012          Respectfully submitted,


   /s/ Ankur J. Goel
Ankur J. Goel
M. Miller Baker
Johnny H. Walker
McDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, DC 20001
Telephone:  202.756.8000
Facsimile:   202.756.8087

*Attorneys for Appellants*

## THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**ADIRONDACK MEDICAL CENTER**, et al.,

        Appellants,

    v.

**KATHLEEN SEBELIUS**, in her official capacity as Secretary of the United States Department of Health and Human Services,

        Appellee.

No. 12-5366

## APPELLANTS' RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, Appellants certify as follows:

(a)    Appellants have no parent companies. No publicly traded entity has a ten percent or greater ownership in any Appellant.

(b)    Appellants are hospitals.

# TABLE OF CONTENTS

APPELLANTS' CERTIFICATE AS TO PARTIES, RULINGS, AND
RELATED CASES .................................................................................................i

APPELLANTS' RULE 26.1 DISCLOSURE STATEMENT ................................xi

TABLE OF CONTENTS.......................................................................... xii

TABLE OF AUTHORITIES .................................................................xv

GLOSSARY OF TERMS ...............................................................................1

JURISDICTIONAL STATEMENT ........................................................3

STATEMENT OF THE ISSUE............................................................3

INTRODUCTION ...........................................................................4

STATEMENT OF FACTS .................................................................5

    A.    The Statutory and Regulatory Framework ...........................5

        1.    Congress's Preferential Treatment of Certain Rural
Hospitals...................................................................5

        2.    Medicare's Payment Formula.........................................6

            a.    The Federal Rate Is Based on the "Standardized
Amount" .......................................................7

            b.    The "Hospital-Specific" Rate Is Derived From
Each Individual Qualifying Rural Hospital's
Actual Operating Costs....................................8

        3.    The Secretary May Adjust Only the Standardized
Amount to Neutralize Certain Changes in Coding
Practices ..................................................................9

    B.    The Secretary's End Run Around Congress's Specific
Instructions ...............................................................10

        1.    The Secretary Established a New Diagnosis Coding
System in 2008............................................................10

2.      The Secretary Proposed Adjusting the Standardized
        Amount in Fiscal Year 2008 and 2009 to Compensate for
        Expected Increased Payments Resulting From Changed
        Coding Behavior by Hospitals ..................................................11

3.      In the TMA, Congress Provided Specific Instructions on
        How to Offset Higher Payments Resulting From
        Documentation and Coding Changes in 2008 and 2009 ..........11

4.      For the Fiscal Years at Issue in 2011 and 2012, the
        Secretary Defied § 1395ww(d)(3)(A)(vi) and the TMA
        and Adjusted Hospital-Specific Rates to Offset Increased
        Payments in 2008 and 2009 ......................................................13

5.      In 2012, Congress Again Reiterated That the Secretary
        May Recoup Higher Payments in 2008 and 2009
        Resulting from Coding Changes Only Through
        Adjustments to the Standardized Amount ................................14

C.      The District Court Proceedings ...........................................................15

SUMMARY OF THE ARGUMENT ....................................................................16

STANDARD OF REVIEW ..................................................................................20

ARGUMENT .......................................................................................................21

The Secretary's Adjustment of Hospital-Specific Rates in 2011 and 2012
Violates § 1395ww(d)(3)(A)(vi) and the TMA .......................................................21

A.      Section 1395ww(d)(3)(A)(vi) Authorizes, and the TMA
        Expressly Requires, the Secretary to Adjust Only the
        Standardized Amount in 2011 and 2012 to Offset Increased
        Payments in 2008 and 2009 ................................................................21

1.      Section 1395ww(d)(3)(A)(vi) Authorizes the Secretary to
        Eliminate the Effect of Coding Changes by Adjusting the
        Standardized Amount .................................................................21

2.      The TMA Specifically Required the Secretary to Offset
        Increased Aggregate Payments in 2008 and 2009 by
        Adjusting the Standardized Amount in 2011 and 2012,
        the Years at Issue in This Case .................................................23

      3.     The Secretary Bifurcated Her Retrospective Evaluation of Claims Data Between the Federal Rate and Hospital-Specific Rate to Justify Adjusting Both the Standardized Amount and the Hospital-Specific Rate to Effect an Offset .................................................................25

      4.     *Chevron* Step One Applies Because § 1395ww(d)(3) and the TMA Are Not Ambiguous .................................................28

  B.    The Specific Command of § 1395ww(d)(3)(A)(vi) and the TMA Govern Over the More General Grant of Authority in § 1395ww(d)(5)(I)(i) ...........................................................30

  C.    The American Taxpayer Relief Act Confirms That the Secretary's Adjustment of the Hospital-Specific Rate Is Unlawful .............................................................................33

  D.    Appellants' Construction of § 1395ww(d)(3)(A)(vi) and the TMA Is Consistent With Congress' Objective of Treating the Hospital-Specific Rate Differently from the Standardized Amount ..............................................................................34

CONCLUSION ........................................................................36

STATUTORY ADDENDUM ...............................................................1a

# TABLE OF AUTHORITIES

## Cases

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ....................................................................29

*Defenders of Wildlife v. Gutierrez*,
  532 F.3d 913 (D.C. Cir. 2008) ...............................................21

*Gonzalez-Vera v. Townley*,
  595 F.3d 379 (D.C. Cir. 2010) ...............................................20

\* *Halverson v. Slater*,
  129 F.3d 180 (D.C. Cir. 1997) ......................................... 23, 29

*HCSC-Laundry v. United States*,
  450 U.S. 1 (1981) .....................................................................30

*Loving v. United States*,
  517 U.S. 748 (1996) .................................................................34

\* *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  132 S. Ct. 2065 (2012) ............................................................32

*Red Lion Broadcasting Co. v. FCC*,
  395 U.S. 367 (1968) .................................................................34

## Statutes

28 U.S.C. § 1291 ........................................................................3

28 U.S.C. § 1331 ........................................................................3

42 U.S.C. § 1395ww(b)(3)..........................................................8

42 U.S.C. § 1395ww(d) ...................................... 6, 7, 8, 9, 17, 22, 23, 25, 28, 30, 31

\* 42 U.S.C. § 1395ww(d)(3)(A)(vi)
  ............................................9, 12, 13, 15, 18, 19, 21, 22, 23, 25, 28, 30, 31, 32, 34

42 U.S.C. § 1395ww(d)(3)(D) ....................................................7

42 U.S.C. § 1395ww(d)(5)(D) ......................................... 5, 8, 9, 22

42 U.S.C. § 1395ww(d)(5)(G) ......................................... 5, 8, 9, 22

42 U.S.C. § 1395ww(d)(5)(I)(i).................................... 15, 16, 17, 18, 30, 31, 32, 33

5 U.S.C. § 706............................................................... 3, 27, 32

Authorities upon which we chiefly rely are marked with asterisks.

* American Taxpayer Relief Act of 2012, Pub. L. 112-240,
§ 631, 126 Stat. 2,313, 2,353–54 (2013) ........................................... 14, 15, 20, 33

Balanced Budget Refinement Act of 1999, Pub. L. 106-113,
App. F, § 411, 113 Stat. 1501, 1501A-377 (1999)..................................................6

TMA [Transitional Medical Assistance], Abstinence Education and
QI Programs Extension Act of 2007, Pub L. 110-90, § 7(a), 121
Stat. 984 (2007) ...................................................................................................12

* TMA [Transitional Medical Assistance], Abstinence Education and
QI Programs Extension Act of 2007, Pub L. 110-90, § 7(b)(1), 121
Stat. 984 (2007) ........................................... 12, 21, 23, 24, 25, 27, 29

## Regulations

42 C.F.R. § 412.108(c)................................................................................8

42 C.F.R. § 412.60 ......................................................................................6

42 C.F.R. § 412.64 ......................................................................................7

42 C.F.R. § 412.73–.79 ...............................................................................8

42 C.F.R. § 412.92(d) .................................................................................8

## Other Authorities

*Changes to the Hospital Inpatient Prospective Payment System and
FY 2008 Payment Rates* (Final Rule with Comment), 72 Fed. Reg.
47,130 (Aug. 22, 2007)............................................................................11

*Changes to the Hospital Inpatient Prospective Payment System and
FY 2008 Payment Rates* (Final Rule), 72 Fed. Reg. 66,580 (Nov.
27, 2007)..................................................................................................12

*Changes to the Hospital Inpatient Prospective Payment Systems and
Fiscal Year 2009 Rates*, 73 Fed. Reg. 48,434 (Aug. 19, 2008) ..........................12

*Hospital Inpatient Prospective Payment System Changes and FY 2011
Rates* (Final Rule), 75 Fed. Reg. 50,042 (Aug. 16, 2010) ..................... 13, 24, 26

*Hospital Inpatient Prospective Payment Systems for Acute Care
Hospitals and the Long-Term Care Hospital Prospective Payment
System and Fiscal Year 2013 Rates* (Final Rule), 77 Fed. Reg.
53,258 (Aug. 31, 2012)............................................................................14

*Hospital Inpatient Prospective Payment Systems for Acute Care
Hospitals and the Long-Term Hospital Prospective Payment System*

*and FY 2012 Rates* (Final Rule), 76 Fed. Reg. 51,476 (Aug. 18, 2011) .......................................................................................... 14, 26

MEDPAC, REPORT TO THE CONGRESS: MEDICARE IN RURAL AMERICA 20 (2001) ............................................................................................5

*Proposed Changes to the Hospital IPPS for Acute Care Hospitals and Proposed Fiscal Year 2011 Rates* (Proposed Rule), 75 Fed. Reg. 23,852 (May 4, 2010) ..........................................................................13

# GLOSSARY OF TERMS

**Base Dollar Amount—**"Base dollar amount" is the term Appellants use in their brief to refer to the dollar-based portion of the payment rate. It is either the standardized amount (in the federal rate) or the target amount (in the hospital-specific rate).

**Diagnosis-Group Weight or DRG Weight** – The numerical value that applies for each diagnosis reflecting the relative cost of providing hospital services to a patient with that diagnosis.

**Federal Rate—**The federal rate is the default payment rate that Medicare pays to most hospitals for providing inpatient services. The federal rate for a given patient is the product of a base dollar amount called the "standardized amount," a variety of adjustment factors, and the diagnosis-group weight for that patient's diagnosis.

**Hospital-Specific Rate—**Hospital-specific rates are special payment rates that Medicare uses to pay certain qualifying hospitals for providing inpatient services. The hospital-specific rate for a given patient is the product of a base dollar amount called the "target amount" and the diagnosis-group weight for that patient's diagnosis.

**Medicare Dependent Hospitals—**A Medicare Dependent Hospital, or "MDH," is a hospital that meets all four of the following statutory criteria: (i) it is in a rural area; (ii) it has no more than 100 beds; (iii) sixty percent of its patients are Medicare beneficiaries. A Medicare dependent small rural hospital is paid the federal rate plus seventy-five percent of the amount by which its hospital-specific rate exceeds the federal rate. Every appellant that is not a Sole Community Hospital is a Medicare Dependent Hospital.

**Sole Community Hospital—**A sole community hospital, or "SCH," is a hospital that by virtue of its geographic isolation, is the sole source of hospital services for a large service area. To qualify as a sole community hospital, a facility generally must demonstrate that it is a certain distance or drive time from another hospital. A sole community hospital is paid either the hospital-specific rate or the federal rate, whichever is higher. Every appellant that is not a Medicare Dependent Hospital is a Sole Community Hospital.

**Standardized Amount—**The standardized amount is the base dollar amount used in the federal rate payment formula.  Unlike the target amount, it applies a standard amount to all hospitals without regard for their individual historic actual costs.

**Target Amount—**A target amount is the base dollar amount for the hospital-specific rates.  Unlike the standardized amount, it is based on the historic costs of the hospital being paid in a particular base year.

**TMA**—The Transitional Medical Assistance, Abstinence Education and QI Programs Extension Act of 2007, Pub L. 110-90, 121 Stat. 984 (2007).

**Qualifying Rural Hospital—**"Qualifying Rural Hospital" is the term Appellants use in their brief to refer to a hospital that is either a Sole Community Hospital or a Medicare Dependent Hospital.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over these consolidated cases under 28 U.S.C. § 1331 because the cases arise under the laws of the United States governing administrative procedure, 5 U.S.C. § 706, and the Medicare program, 42 U.S.C. §§ 1395 *et seq.*

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291. The district court issued its final judgment on September 17, 2012, and Appellants timely filed their notice of appeal on November 15, 2012.

## STATEMENT OF THE ISSUE

The Medicare statute gives various payment preferences—in effect, subsidies—to Qualifying Rural Hospitals in order to support their economic viability in areas underserved by medical providers. One such preference is to reimburse Qualifying Rural Hospitals at the *higher* of two alternative rates—the "federal rate" paid to all hospitals, or a "hospital-specific rate." Those Qualifying Rural Hospitals are the Appellants in this case.

In 2007, the Centers for Medicare and Medicaid Services implemented a new coding system used to determine payment for services furnished to program beneficiaries. Congress determined that this new coding system might result in higher payments to hospitals. To offset any resulting higher aggregate payments made to hospitals under *both* the federal rate and the hospital-specific rate in 2008

3

and 2009, Congress directed the Secretary to adjust the "standardized amount" used for calculating the federal rate in 2011 and 2012. The Secretary adjusted the standardized amount, as instructed; however, the Secretary *also* adjusted the hospital-specific rates, resulting in a lower net reduction of the federal rate. The question presented in this case is:

Whether the Secretary's adjustment to the hospital-specific rate in 2011 and 2012 to offset increased aggregate hospital payments made in 2008 and 2009 violates the express statutory directive of Congress to adjust the "standardized amount" to effect that offset.

## INTRODUCTION

This case involves a challenge to certain agency actions affecting payments to Qualifying Rural Hospitals for inpatient services under Medicare, the national health-insurance program for the aged and disabled administered by the Secretary of the Department of Health and Human Services (through the Department's Centers for Medicare and Medicaid Services ("CMS")). Appellants are rural, financially vulnerable hospitals to which Congress has provided payment protections to ensure their continued viability and ability to provide critical hospital services to Medicare beneficiaries in their underserved communities.

The Secretary reduced Medicare payments to the appellant hospitals, which challenged the reductions, first administratively, and then in district court.

4

Appellant hospitals appeal the district court's dismissal of their action to set aside the Secretary's payment decisions.

## STATEMENT OF FACTS

**A.    The Statutory and Regulatory Framework**

**1.    Congress's Preferential Treatment of Certain Rural Hospitals**

The Medicare statute imposes financial discipline on hospitals by paying them prospectively set rates.  Since the inception of this prospective payment system, Congress has identified certain communities where healthcare services are lacking, or where the healthcare infrastructure is particularly fragile; to maintain healthcare services in these areas, Congress has taken steps to ensure the financial viability through favored payment treatment of hospitals serving those areas.

"Sole Community Hospitals" are one such category of hospital singled out by Congress for special payment treatment.  Sole Community Hospitals are isolated hospitals that are the only source of hospital services in their community. 42 U.S.C. § 1395ww(d)(5)(D).  "Medicare Dependent Hospitals" are rural hospitals whose patients are mostly Medicare beneficiaries.  *Id.* § 1395ww(d)(5)(G).  These hospitals face unique economic challenges due to various local demographic factors; yet they are critical to their communities because there is often no other source of hospital care for the Medicare populations they serve.  MedPAC, Report to the Congress: Medicare in Rural America 20 (2001); *see also id.* at 56 (noting the "deteriorating financial performance of

5

many rural hospitals under Medicare").[1]   (Appellants refer to Sole Community Hospitals and Medicare Dependent Hospitals collectively as "Qualifying Rural Hospitals.")   To ensure the financial viability of Qualifying Rural Hospitals, Congress has afforded them special, preferred treatment.

### 2.      Medicare's Payment Formula

When a hospital provides services like board, nursing care, and drugs to a Medicare beneficiary during an inpatient stay, the Secretary pays the hospital for those services based not on the actual cost or quantity of services provided, but by using a prospectively set rate based on the projected costs to treat the beneficiary's particular diagnosis.  Congress established this prospective payment system under Section 1886(d) of the Social Security Act, 42 U.S.C. § 1395ww(d).

Every year, the Secretary classifies each potential diagnosis into 1 of about 750 diagnosis-related groups and assigns a numerical weight to each group based on how costly she projects it will be to provide hospital services for the diagnoses in that group.  *See* 42 U.S.C. § 1395ww(d)(4); 42 C.F.R. § 412.60.  For example,

---

[1]  The Medicare Payment Advisory Commission (a.k.a., MedPAC) is an independent federal body established to advise Congress on Medicare issues.  It published the cited report in response to direction from Congress that it "examine and evaluate the adequacy and appropriateness of the categories of special payments (and payment methodologies) established for rural hospitals under the medicare [*sic*] program, and the impact of such categories on beneficiary access and quality of health care services."  Balanced Budget Refinement Act of 1999, Pub. L. 106-113, App. F, § 411, 113 Stat. 1501, 1501A-377 (1999).

the weight assigned for a costly heart transplant is 11.754, while the weight assigned to a less-costly headache is 0.6355.

As discussed below, the payment a hospital receives for treating a beneficiary is the product of the diagnosis weight and a base dollar amount: either the standardized amount, or—in the case of Qualifying Rural Hospitals—an amount derived from an individual hospital's actual operating costs in a specified period, if this hospital-specific rate is higher than the standardized amount.

### a.    The Federal Rate Is Based on the "Standardized Amount"

Qualifying Rural Hospitals are paid on the basis of one of two rates: the "federal rate" or a "hospital-specific rate."  The vast majority of hospitals (nearly 90 percent, including all hospitals that are not Qualifying Rural Hospitals)  are paid solely using the federal rate formula.  *See* 42 U.S.C. § 1395ww(d)(1)(A); 42 C.F.R. § 412.64.  The federal rate is the product of several factors, including a base dollar amount called the "standardized amount."   *See* 42 U.S.C. § 1395ww(d)(2)(C). When it comes time to pay a hospital for furnishing inpatient services to a Medicare beneficiary, the Secretary multiplies the federal rate (based on the standardized amount) by the diagnosis-group weight, and that product equals the payment to the hospital.[2] *See id.* § 1395ww(d)(3)(D).

---

[2] This is a simplification.  Congress has given the Secretary detailed instructions to further adjust payments to account for a variety of concerns.  For example, to

**b.    The "Hospital-Specific" Rate Is Derived From Each Individual Qualifying Rural Hospital's Actual Operating Costs**

Congress has specified that Qualifying Rural Hospitals are to be paid using the hospital-specific rate, if that rate is higher than the standardized amount.  *See* 42 U.S.C. § 1395ww(d)(5)(D), (G); 42 C.F.R. §§ 412.92(d), .108(c).  Under the hospital-specific rate formula, the base dollar amount is based on that hospital's actual operating costs in a specific year.  *See* 42 U.S.C. § 1395ww(b)(3); 42 C.F.R. § 412.73–.79.  This special base dollar amount is called the "target amount."  42 U.S.C. § 1395ww(b)(3).  When it comes time to pay a Qualifying Rural Hospital for providing care, the Secretary multiplies the target amount by the diagnosis-group weight for that patient's diagnosis.  That product, known as the "hospital-specific rate," determines the hospital's reimbursement amount—unless the hospital-specific rate is lower than the federal rate, in which case the federal rate is the applicable reimbursement rate.  *Id.* § 1395ww(d)(5)(D), (G); 42 C.F.R. § 412.92(d), .108(c).  That is, Qualifying Rural Hospitals get the benefit of whatever is the highest applicable rate—either the federal rate, based on the

---

factor in regional labor costs, 42 U.S.C. § 1395ww(d)(2)(H), to compensate hospitals that provide teaching to medical students, *id.* § 1395ww(d)(5)(B), and to pay more to hospitals that treat a disproportionate share of low-income patients, *id.* § 1395ww(d)(5)(F).

"standardized amount," or the hospital-specific rate, based on the individual hospital's operating costs.[3] These two payment formulas are illustrated here:

Federal Rate = (Standardized Amount) x (Other Factors) x (Diagnosis-group weight)

Hospital-Specific Rate = (Target Amount) x (Diagnosis-group weight)

### 3. The Secretary May Adjust Only the Standardized Amount to Neutralize Certain Changes in Coding Practices

Congress requires the Secretary to annually update diagnosis-group weights to reflect new treatment patterns and technologies that may alter the costs associated with some diagnoses. *See* 42 U.S.C. § 1395ww(d)(4)(C). Because some hospitals may appropriately change their coding and documentation practices in response to these new weights in a way that increases payments, in 2000 Congress authorized the Secretary to adjust the "standardized amount" used to calculate the federal rate so as to neutralize the effect of those changes on aggregate payments under *both* the federal and hospital-specific rates. *See id.* § 1395ww(d)(3)(A)(vi) ("Insofar as the Secretary determines that the adjustments

---

[3] Specifically, Sole Community Hospitals are paid entirely based on the hospital-specific rate if it would yield higher payments than payment using the standardized amount. *Id.* § 1395ww(d)(5)(D). Medicare Dependent Hospitals are similarly paid based on the hospital-specific rate if it is higher than the standardized amount; however, the total payment is a blend—the payments under the standardized amount plus 75% of the amount by which the hospital-specific rate exceeds the standardized amount. 42 U.S.C. § 1395ww(d)(5)(G).

under paragraph (4)(C)(i) . . . *result in a change in aggregate payments under this subsection* . . . that are a result of changes in the coding or classification of discharges that do not reflect real changes in case mix, the Secretary may adjust the average *standardized amounts* computed under this paragraph for subsequent fiscal years *so as to eliminate the effect of such coding or classification changes*.") (emphasis added).  Because the "aggregate payments under this subsection" refers to the aggregate of both federal rate and hospital-specific rate payments, Congress authorized the Secretary to offset such aggregate higher payments by adjusting in subsequent years the "standardized amount" used to calculate the federal rate.

## B.     The Secretary's End Run Around Congress's Specific Instructions

This case arises because the Secretary ignored Congress's instructions and reduced Appellants' hospital-specific rates in 2011 and 2012 to offset payments from 2008 and 2009 that Congress directed be offset through adjustments to the standardized amount (from which the federal rate is derived) in 2011 and 2012.

### 1.     The Secretary Established a New Diagnosis Coding System in 2008

Beginning with fiscal year 2008, the Secretary substantially overhauled the diagnosis classifications and their corresponding weights.  She replaced approximately 500 diagnosis-related groups with about 750 Medicare Severity Diagnosis Related Groups ("MS-DRGs").  *Changes to the Hospital Inpatient Prospective Payment System and FY 2008 Payment Rates* (Final Rule with

Comment), 72 Fed. Reg. 47,130, 47,138 *et seq.* (Aug. 22, 2007). The new coding

system provided greater precision to the diagnosis-related groups.

> **2.    The Secretary Proposed Adjusting the Standardized Amount in Fiscal Year 2008 and 2009 to Compensate for Expected Increased Payments Resulting From Changed Coding Behavior by Hospitals**

In implementing the new MS-DRG coding system, the Secretary also

anticipated that payments to hospitals would increase as a result of more refined

coding practices by hospitals. *Id.* at 47,176 ("[W]e believe that adoption of the

proposed MS–DRGs would create a risk of increased aggregate levels of payment

as a result of increased documentation and coding."). Invoking her authority under

§ 1395ww(d)(3), the Secretary sought to prevent an increase in aggregate

payments because of changes in coding practices, and so directed a downward

adjustment of 1.2 and 1.8 percent, respectively, to the standardized amount (used to

calculate the federal rate) for fiscal years 2008 and 2009. 72 Fed. Reg. at 47,186.

> **3.    In the TMA, Congress Provided Specific Instructions on How to Offset Higher Payments Resulting From Documentation and Coding Changes in 2008 and 2009**

On September 29, 2007, shortly after the Secretary announced her intent to

implement the MS-DRGs and make a 1.2 percent downward adjustment to the

standardized amount on August 22, 2007, but before either change was to be

implemented on October 1, 2007, Congress redirected the Secretary by reducing

the fiscal year 2008 adjustment of the standardized amount to -0.6% and the fiscal

year 2009 adjustment to -0.9%—reductions amounting to half what the Secretary planned. TMA [Transitional Medical Assistance], Abstinence Education and QI Programs Extension Act of 2007, Pub L. 110-90, § 7(a), 121 Stat. 984 (2007) ("TMA"). The TMA further directed the Secretary to conduct a retrospective analysis of claims data for 2008 and 2009, and, if the TMA's required prospective adjustments did not offset the increase in payments resulting from the coding changes in 2008 and 2009, to offset all such additional amounts by further adjusting the *standardized amount* in fiscal years 2010, 2011, and 2012. *Id.* § 7(b)(1).

The Secretary did as instructed with respect to Congress's mandated 0.6 percent adjustment for fiscal year 2008. In doing so, she specifically noted that Congress had allowed her to adjust only the standardized amount, and not hospital-specific rates. *Changes to the Hospital Inpatient Prospective Payment System and FY 2008 Payment Rates* (Final Rule), 72 Fed. Reg. 66,580, 66,887 (Nov. 27, 2007) (noting that § 1395ww(d)(3)(A)(vi) "only provides authority to adjust the average standardized amounts, and does not refer to the hospital-specific rates").

Similarly, the Secretary made the mandated -0.9 percent adjustment to the standardized amount for fiscal year 2009. *Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2009 Rates*, 73 Fed. Reg. 48,434, 48,447–49 (Aug. 19, 2008)).

12

**4.    For the Fiscal Years at Issue in 2011 and 2012, the Secretary Defied § 1395ww(d)(3)(A)(vi) and the TMA and Adjusted Hospital-Specific Rates to Offset Increased Payments in 2008 and 2009**

In fiscal year 2011, the Secretary reversed course and proclaimed that she would also begin reducing hospital-specific rates to recover increases in payments resulting from changes in coding practices in 2008 and 2009. *Proposed Changes to the Hospital IPPS for Acute Care Hospitals and Proposed Fiscal Year 2011 Rates* (Proposed Rule), 75 Fed. Reg. 23,852, 23,871–74 (May 4, 2010).    She asserted that even though Congress directed her to account for changes in coding practices by adjusting only the standardized amount, she could nevertheless account for changes in coding practices in any way she sees fit under a general grant of authority.    *Id.* at 23,872 (quoting 42 U.S.C. § 1395ww(d)(5)(I)(i) (authorizing the Secretary to "provide by regulation for such other exceptions and adjustments to such payment amounts . . . as the Secretary deems appropriate")).

Various hospitals, including Appellants, objected that the Secretary was unlawfully depriving them of a protection afforded by Congress and argued that she must follow Congress's specific instructions for coding-practice adjustments. The Secretary rejected these objections and finalized her rule. *Hospital Inpatient Prospective Payment System Changes and FY 2011 Rates* (Final Rule), 75 Fed. Reg. 50,042, 50,068–71 (Aug. 16, 2010).    She has continued her practice of adjusting hospital-specific rates for fiscal years 2012 and 2013. *Hospital Inpatient*

13

*Prospective Payment Systems for Acute Care Hospitals and the Long-Term Hospital Prospective Payment System and FY 2012 Rates* (Final Rule), 76 Fed. Reg. 51,476, 51,498–99 (Aug. 18, 2011); *Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Prospective Payment System and Fiscal Year 2013 Rates* (Final Rule), 77 Fed. Reg. 53,258, 53,277–78 (Aug. 31, 2012).

**5. In 2012, Congress Again Reiterated That the Secretary May Recoup Higher Payments in 2008 and 2009 Resulting from Coding Changes Only Through Adjustments to the Standardized Amount**

In the very recently enacted American Taxpayer Relief Act of 2012 ("ATRA"), Congress again instructed the Secretary on how to adjust for changes in coding practices that produced higher payments in 2008 and 2009. Congress for the second time specifically instructed the Secretary to "fully offset . . . the increase in aggregate payments from fiscal years 2008 through 2013" by making an "adjustment to the standardized amounts." Pub. L. 112-240, § 631(b)(2)(ii), 126 Stat. 2,313, 2,353 (2013).

Moreover, in seeming direct response to the Secretary's assertion that she had general authority to bypass the TMA's specific direction on how she is to offset increased payments from 2008 and 2009, Congress "clarified" that Congress's instructions in the TMA are the *only* means by which the Secretary has authority to recoup higher payments incurred in fiscal years 2008 and 2009:

14

> C<small>LARIFICATION</small>.—Effective on the date of the enactment of this section, except as provided in section 7(b)(1)(B)(ii) of the TMA, Abstinence Education, and QI Programs Extension Act of 2007, as added by subsection (b)(2)(A)(ii)(IV) of this section, the Secretary of Health and Human Services *shall not have authority to fully recoup past overpayments related to documentation and coding changes from fiscal years 2008 and 2009.*

*Id.* § 631(a)(2) (emphasis added). As noted above, the TMA directed that the Secretary exclusively adjust the *standardized amount*. Despite this clarification, the Secretary has not reversed her position.

## C.     The District Court Proceedings

Appellants, after exhausting their administrative options, filed these lawsuits challenging the Secretary's adjustments for fiscal years 2011 and 2012. The Secretary moved to dismiss, and Appellants cross-moved for summary judgment.

The district court granted the Secretary's motion to dismiss, holding that the Secretary's interpretation was permissible under step two of *Chevron* review. The court reasoned that § 1395ww(d)(3)(A)(vi) and the TMA address only adjustments to the standardized amount, and do not limit the general adjustment authority at § 1395ww(d)(5)(I)(i) such that the former must apply over the latter (D.E. 24 at 13, 17), nor are the provisions redundant such that an interpretation giving rise to surplusage must be avoided (*id.* at 15). Furthermore, the court said, to hold otherwise would work a repeal by implication, which is disfavored, because the

general authority in § 1395ww(d)(5)(I)(i) was codified before the limitations on which Appellants base their arguments. (*Id.* at 13–14.)

Ultimately, the district court simply decided that there is "no logical reason" why Congress would want to protect Qualifying Rural Hospitals from having their payments reduced to make up for national average changes in coding practices. (*Id.* at 18.) If Congress wanted to do that, the court said, it would have done it explicitly; targeting the standardized amount and excluding the hospital-specific rate does not go far enough. (*Id.*)

Having granted the motion to dismiss, the district court denied Appellants' cross-motion for summary judgment.

This appeal followed.

## SUMMARY OF THE ARGUMENT

Medicare pays hospitals according to two different payment formulas. Most hospitals are reimbursed according to a formula called the "federal rate," which is based on the "standardized rate." Certain rural and other hospitals in medically underserved areas, referred to herein as "Qualifying Rural Hospitals," are paid the higher of the federal rate or the "hospital-specific" rate. The latter is tied to the hospital's specific operating costs. By paying such hospitals the *higher* of the federal rate or the hospital-specific rate, Congress sought to enhance their economic viability.

In 2008 and 2009, aggregate Medicare payments to hospitals paid under 42 U.S.C. § 1395ww(d)—which both includes hospitals paid according to the federal rate, as well as hospitals paid according to the hospital-specific rate—increased because of certain changes to the coding of diagnoses. Section 1395ww(d)(3)(A)(vi) authorized, and a 2007 statutory enactment of Congress called the "TMA" required, the Secretary to offset these increased federal and hospital-specific rate payments in 2008 and 2009 by adjusting the "standardized amount." Thus, Congress instructed the Secretary to reduce *only* federal rate payments in 2011 and 2012 to offset the higher federal rate *and* hospital-specific rate payments in 2008 and 2009 resulting from coding changes.

The Secretary, after initially admitting that § 1395ww(d)(3)(A)(vi) and the TMA limited her authority to adjusting only the standardized amounts, changed course. Invoking a supposed general authority under § 1395ww(d)(5)(I)(i) to "provide by regulation for such other exceptions and adjustments to such payment amounts . . . as the Secretary deems appropriate," the Secretary adjusted not *only* the standardized amount in 2011 and 2012, as required by § 1395ww(d)(3)(A)(vi) and the TMA, but *also* the hospital-specific rate. In adjusting the hospital-specific rate in 2011 and 2012 to partially offset the overpayments of 2008 and 2009, the Secretary necessarily reduced the size of the parallel adjustments to the standardized amount in 2011 and 2012. As a result, the adjustments made to the

17

standardized amount in 2011 and 2012 were smaller than they would have been if the Secretary had—as § 1395ww(d)(3)(A)(vi) authorized and the TMA required—fully offset the overpayments by adjusting only the standardized amount.

A.    In so adjusting the hospital-specific rates in 2011 and 2012 to offset the overpayments of 2008 and 2009, the Secretary violated § 1395ww(d)(3)(A)(vi) and the TMA, which authorize (in the case of the former) and require (in the case of the latter) the Secretary to adjust the standardized amount to fully effect that offset.  Under the *expressio unius* canon, Congress's specific direction that the Secretary adjust only the standardized amount to fully offset overpayments in 2008 and 2009 precluded the Secretary from also adjusting the hospital-specific rate to effect a portion of that offset.

B.    The general authority conferred upon the Secretary in § 1395ww(d)(5)(I)(i) provides no refuge for the Secretary's violation of § 1395ww(d)(3)(A)(vi) and the TMA, because the latter provisions, as the more specific, control.  The district court rejected application of this general/specific canon, reasoning that there was no conflict between the Secretary's exercise of general authority under § 1395ww(d)(5)(I)(i) to adjust the hospital-specific rates, and  § 1395ww(d)(3)(A)(vi) and the TMA.  Specifically, the district court reasoned that the adjustment of the hospital-specific rate did "not impact the adjustment to the federal rate under § 1395ww(d)(3)(A)(vi) and TMA."  (D.E. 24 at 15 n.13.)

18

The district court's conclusion that the Secretary's adjustment of the hospital-specific rate did "not impact" the Secretary's adjustment of the federal rate is demonstrably wrong.  Both adjustments were made to offset a *specific sum* of overpayments made in 2008 and 2009.  Although Congress specifically directed that those overpayments be offset by adjustments only to the federal rate, the Secretary—apparently for her own policy reasons—concluded that it would be more equitable to spread the offset between hospitals paid according to the federal rate and hospitals paid according to the hospital-specific rate.  Whatever the merits of that decision as a matter of policy, it conflicted with § 1395ww(d)(3)(A)(vi) and the TMA, which required the offset in 2011 and 2012 to be borne entirely by hospitals paid according to the federal rate.  Hence, the general/specific canon applies here, and the Secretary's adjustments of the hospital-specific rate were unlawful.

C.     Any doubts concerning the unlawfulness of the Secretary's challenged actions here were eliminated by yet another statutory directive of Congress.  After this appeal was noticed, in the final days of 2012, Congress enacted the American Taxpayer Relief Act of 2012.  That Act specifically directed that the Secretary only make adjustments to the standardized amount.  Moreover, Congress expressly "clarified" that the Secretary lacks any authority—other than that specified in the TMA—"to fully recoup past overpayments related to documentation and coding

changes from fiscal years 2008 and 2009." American Taxpayer Relief Act of 2012, Pub. L. 112-240, § 631, 126 Stat. 2,313, 2,353–54 (2013). In so clarifying, Congress thereby repudiated the district court's decision that the Secretary possessed general authority to make adjustments to the hospital-specific rate to offset such overpayments.

D.     Congress's requirement that the Secretary adjust only the standardized amount, as opposed to the hospital-specific rate, is fully consistent with Congress's practice of treating the standardized amount and the hospital-specific rate differently. Reflecting the substantial conceptual difference between the two, Congress has routinely not applied adjustments to the hospital-specific amount that it has applied to the standardized amount. That Congress did not do so here either is no surprise.

* * *

This Court should reverse the district court's dismissal of Appellants' complaint, and grant Appellants' motion for summary judgment that the district court denied as moot.

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's grant of a motion to dismiss, *Gonzalez-Vera v. Townley*, 595 F.3d 379, 381 (D.C. Cir. 2010), as well as the

district court's denial of Appellants' motion for summary judgment, *Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 918 (D.C. Cir. 2008).

## ARGUMENT

### The Secretary's Adjustment of Hospital-Specific Rates in 2011 and 2012 Violates § 1395ww(d)(3)(A)(vi) and the TMA

A. **Section 1395ww(d)(3)(A)(vi) Authorizes, and the TMA Expressly Requires, the Secretary to Adjust Only the Standardized Amount in 2011 and 2012 to Offset Increased Payments in 2008 and 2009**

The two key statutory provisions in this case are 42 U.S.C. § 1395ww(d)(3)(A)(vi), enacted in 2000, and Section 7 of the TMA, enacted in 2007. Both provisions prescribe a solution to a problem: implementation of a new coding system resulted in increases in payments; the Secretary is to eliminate the effect of those changes – *i.e.,* the higher payments – by adjusting the standardized amount. That is to say, although the coding change may result in higher payments to hospitals paid under *both* federal rates and hospital-specific rates, Congress directed the Secretary to "eliminate the effect of such coding or classification changes" by adjusting *only* the standardized amount.

1. **Section 1395ww(d)(3)(A)(vi) Authorizes the Secretary to Eliminate the Effect of Coding Changes by Adjusting the Standardized Amount**

Section 1395ww(d)(3)(A)(vi) provides as follows:

> Insofar as the Secretary determines that the adjustments under paragraph (4)(C)(i) [providing for annual changes to the diagnosis-related groups] for a previous fiscal year (or estimates

21

that such adjustments for a future fiscal year) did (or are likely to) result in a change *in aggregate payments under this subsection* during the fiscal year that are a result of changes in the coding or classification of discharges that do not reflect real changes in the case mix, the Secretary may adjust *the average standardized amounts* computed under this paragraph for subsequent fiscal years *so as to eliminate the effect* of such coding or classification changes.

42 U.S.C. § 1395ww(d)(3)(A)(vi) (emphasis added).

Section (d)(3)(A)(vi) grants the Secretary permissive authority to resolve a problem: the Secretary "may" adjust the *standardized amount*. Nonetheless, § (d)(3)(A)(vi) is indisputably prescriptive about how the Secretary is to resolve the specified problem, should the Secretary identify a problem, and choose to address it. Pursuant to § (d)(3)(A)(vi), if the Secretary determines that coding changes will or are likely to result in increases "in aggregate" or total payments under § 1395ww(d), Congress specified that the Secretary is to "eliminate the effect of" these changes by adjusting the standardized amount. "[A]ggregate payments under this subsection" means all payments made under § 1395ww(d). Hospitals paid using a hospital-specific rate, just like hospitals paid using the standardized amount, are paid under § 1395ww(d).[4] By identifying higher

---

[4] *See* 42 U.S.C. § 1395ww(d)(5)(1)(A) (providing general instructions for payments to subsection (d) hospitals for inpatient services); 42 U.S.C. § 1395ww(d)(5)(D)(i) (providing specific instructions on the calculation of payments to subsection (d) hospitals that are Sole Community Hospitals under § 1395ww(d)(5)(1)(A)); 42 U.S.C. § 1395ww(d)(5)(G)(i) (providing specific

aggregate payments, and then directing the Secretary to offset *all* (aggregate) of those higher payments by adjusting the standardized amount—Congress "intended to exclude" adjustments to the hospital-specific rate. *Halverson v. Slater*, 129 F.3d 180, 185 (D.C. Cir. 1997) (applying *expressio unius* canon).

 **2.** **The TMA Specifically Required the Secretary to Offset Increased Aggregate Payments in 2008 and 2009 by Adjusting the Standardized Amount in 2011 and 2012, the Years at Issue in This Case**

In enacting the TMA in 2007, Congress went further than it did in § (d)(3)(A)(vi), which merely *authorized* the Secretary to eliminate increases in payments resulting from coding changes by adjusting the standardized amount. In the TMA, Congress specifically *directed* the Secretary to "offset . . . [an] increase or decrease in aggregate payments" under § 1395ww(d) by adjusting the *standardized amount*. TMA § 7(b)(1)(B). The Secretary's adjustment to hospital-specific rates conflicts with these instructions. Because these instructions are specific, mandatory, and exclusive of any other authority, the Secretary's action is contrary to law, arbitrary, and capricious.

Section 7(b)(1) of the TMA provides:

> (b)(1) *Notwithstanding any other provision of law*, if the Secretary determines that implementation of [MS-DRGs]

---

instructions on the calculation of payments to subsection (d) hospitals that are Medicare Dependent Hospitals under § 1395ww(d)(5)(1)(A)).

resulted in changes in coding and classification that did not reflect real changes in case mix under *[42 U.S.C. § 1395ww(d)]* for discharges occurring during fiscal year 2008 or 2009 that are different from [adjustments mandated by Congress in Subsection 7(a)], the Secretary shall—

    (A) make an appropriate adjustment under paragraph (3)(A)(vi) of such [42 U.S.C. § 1395ww(d)]; and

    (B) make an additional adjustment *to the standardized amounts* under such section [42 U.S.C. § 1395ww(d)] for discharges occurring only during fiscal years 2010, 2011, and 2012 to *offset* the estimated amount of the increase or decrease *in aggregate payments* (including interest as determined by the Secretary) . . . *based upon a retrospective evaluation of claims data* . . . during fiscal years 2008 and 2009.

(emphasis added.)

Section 7(b)(1) of the TMA specifically directs the Secretary in three ways. First, the Secretary is directed to retrospectively evaluate "claims data submitted under such Medicare Severity Diagnosis Related Group (MS-DRG) system with respect to discharges occurring during fiscal years 2008 and 2009." *Id.* § 7(b)(1)(B).  This claims data necessarily includes payments to hospitals paid according to the hospital-specific rate, as "hospitals paid based on the hospital-specific rate use the same MS–DRG system as other hospitals."  75 Fed. Reg. at 50,068.

Pursuant to this Section and this retrospective study, the Secretary is next instructed to offset increases or decreases "in aggregate payments" for 2008 and

2009. TMA § 7(b)(1)(B). As with the similar language included in 42 U.S.C. § 1395ww(d)(3)(A)(vi), "aggregate payments" means *all* payments made under § 1395ww(d). As noted above, hospitals paid using a hospital-specific rate, just like hospitals paid using the standardized amount, are paid under § 1395ww(d). Finally, and most importantly, the Secretary is directed to offset the totality of payment increases by making an "adjustment *to the standardized amount*" in 2010, 2011, and 2012. TMA § 7(b)(1)(B) (emphasis added).

As with § 1395ww(d)(3)(A)(vi), the *expressio unius* canon applies here. By mandating adjustments to the "standardized amount" in 2010, 2011, and 2012 to offset the increases in aggregate payments in 2008 and 2009, Congress precluded the Secretary from adjusting the *hospital-specific rate* to effect some or all of that offset.

### 3.   The Secretary Bifurcated Her Retrospective Evaluation of Claims Data Between the Federal Rate and Hospital-Specific Rate to Justify Adjusting Both the Standardized Amount and the Hospital-Specific Rate to Effect an Offset

Rather than conducting the retrospective review mandated by the TMA— one which evaluated claims data for both federal rate and hospital-specific payments in 2008 and 2009 to yield a total sum requiring an offset—the Secretary *bifurcated* her retrospective analysis between payments made under the federal rate and the hospital-specific rate. The Secretary made no secret that her intention in so doing was to shift a portion of the adjustment mandated by the TMA from hospitals

paid according to the federal rate to hospitals paid according to the hospital-specific rate: "[W]e continue to believe that this is the appropriate policy so as to neither advantage or disadvantage different types of providers." 75 Fed. Reg. at 50,069–70.

First, the Secretary found that changes in coding practices in 2008 and 2009 did not reflect real changes in the case mix for payments made according to the *federal rate*. *See id.* at 50,059–062. She therefore made adjustments to the standardized amount in 2011 and 2012 to offset these increased payments. *Id.* at 50,067 (2011); 76 Fed. Reg. at 51,497 (2012). Critically for present purposes, however, the adjustments to the standardized amount were *lower* than they would have been if the study had included claims data based on the hospital-specific rate.

The Secretary similarly conducted separate studies for 2011 and 2012 to determine whether changes in coding practices in 2008 and 2009 do not reflect real changes in the case mix for payments made according to the *hospital-specific rate*, and found that it did. But rather than offset these increased payments from 2008 and 2009 by adjusting the *standardized amount*, as the TMA required, the Secretary adjusted the hospital-specific rate in both 2011 and 2012. *See* 75 Fed. Reg. at 50,068–71 (2011); 76 Fed. Reg. at 51,498–97 (2012).

In total, the Secretary adjusted both the standardized amount and the hospital-specific rate in 2011 and 2012 by 5.4 percent. If adjustments of this size

were required of both payment rates to offset the increases in aggregate payments in 2008 and 2009 resulting from the coding change, it necessarily follows that the adjustment to the standardized amount would have had to be *greater* if the Secretary adhered to congressional directive and offset the "increase . . . in aggregate payments" by adjusting the "standardized amounts" alone.

In sum, rather than comply with the statute, the Secretary adjusted the hospital-specific rates for 2011 and 2012 to offset payments that the statute required her to offset by adjusting only the standardized amount. As such, the Secretary's action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(C), and arbitrary, capricious, and not in accordance with the law in violation of 5 U.S.C. § 706(2)(A).

The Secretary has sought to avoid application of the TMA by arguing that the adjustment to the hospital-specific rate was not a result of the retrospective study required by the TMA, and the district court agreed. (*See* D.E. 24 at 17-18.) The flaw in the government's argument, and the district court's acceptance of it, is that TMA § 7(b)(1) required the Secretary to undertake a retrospective study of claims data encompassing *both* payments made under federal rate *and* the hospital-specific rate in 2008 and 2009, and to adjust *the standardized amount* to offset overpayments under *both*. Having bifurcated the retrospective review, the TMA

27

required the Secretary to adjust the standardized amount alone based on the combined result of *both* reviews.

### 4. *Chevron* Step One Applies Because § 1395ww(d)(3) and the TMA Are Not Ambiguous

The district court's most important error was to determine that *Chevron* step one analysis does not apply here "[s]ince § 1395ww(d)(3)(A)(vi) and the TMA are silent on the issue of the adjustments to the hospital-specific rate." (D.E. 24 at 12.) Essentially the district court reasoned that because appellants invoke the *expressio unius* canon, these statutory provisions are ambiguous, and thus *Chevron* step two applies.

Section 1395ww(d)(3)(A)(vi) and the TMA are not at all "silent" regarding the hospital-specific rate. Both provisions state unambiguously that the Secretary is authorized (in the case of the former) and directed (in the case of the latter) to adjust the standardized amount (used to calculate the federal rate) to offset "a change in *aggregate* payments *under this subsection*." 42 U.S.C. § 1395ww(d)(3)(A)(vi). That is, *all* additional payments made under § 1395ww(d) that result from "changes in the coding or classification" are to be recovered by adjusting the standardized amount. *See* 42 U.S.C. § 1395ww(d)(3)(A)(vi) ("Insofar as the Secretary determines that the adjustments under paragraph (4)(C)(i) . . . *result in a change in aggregate payments under this subsection* . . . that are a result of changes in the coding or classification of discharges that do not

28

reflect real changes in case mix, the Secretary may adjust the average *standardized*

*amounts* computed under this paragraph for subsequent fiscal years *so as to*

*eliminate the effect of such coding or classification changes*.") (emphasis added);

TMA § 7(b)(1)(B) (requiring the Secretary to "offset the estimated amount of the

increase or decrease in *aggregate* payments . . . with respect to discharges

occurring during fiscal years 2008 and 2009") (emphasis added); *see also* TMA

§ 7(b)(1)(A). The "aggregate payments" referred to in both provisions are

payments made to hospitals under *both* the standardized amount and hospital-

specific rate.[5]

Thus, in clearly and unambiguously specifying *how* the Secretary is to offset

increases in "aggregate payments" in 2008 and 2009, "Congress had directly

spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Natural Res. Def.*

*Council, Inc.*, 467 U.S. 837, 842 (1984). Because Congress has specified exactly

how the Secretary is to offset the payments in question from 2008 and 2009, the

*expressio unius* canon instructs that Congress precluded the Secretary from also

adjusting the hospital-specific rate to recover these payments. *See Halverson*, 129

F.3d at 185–86 (applying the *expressio unius* canon under *Chevron* step one); *see*

*also id*. at 184 ("[I]f employment of an accepted canon of construction illustrates

---

[5] *See* note 4, *supra*.

29

that Congress had a *specific* intent on the issue in question, then the case can be disposed of under the first prong of *Chevron*." (quoting *Michigan Citizens for an Indep. Press v. Thornburgh*, 868 F.2d 1285, 1292–93 (D.C. Cir. 1989) (emphasis in original), *aff'd by equally divided Court*, 493 U.S. 38 (1989)).

## B.    The Specific Command of § 1395ww(d)(3)(A)(vi) and the TMA Govern Over the More General Grant of Authority in § 1395ww(d)(5)(I)(i)

The district court's second critical error was to hold that the general grant of authority in § 1395ww(d)(5)(I)(i)[6] authorized the Secretary to adjust the hospital-specific rate to recover excess payments made in 2008 and 2009, notwithstanding Congress's specific direction in § 1395ww(d)(3)(A)(vi) and the TMA to adjust only the standardized amount to offset all of the excess payments.   Under the specific/general canon, "a specific statute . . . controls over a general provision . . . particularly when the two are interrelated and closely positioned." *HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981).

The district court reasoned that the specific/general canon does not apply here because it saw no *conflict* between the general grant of authority in § 1395ww(d)(5)(I)(i) and the more specific provisions in § 1395ww(d)(3)(A)(vi) and the TMA.  (*See* D.E. 24 at 14–15 ("To resolve a contradiction within a statute,

---

[6] This provision authorizes the Secretary to "provide by regulation for such other exceptions and adjustments to such payment amounts . . . as the Secretary deems appropriate."  42 U.S.C. § 1395ww(d)(5)(I)(i).

courts often find that a specific provision that *conflicts with* a general provision controls. . . . Here, there is simply no conflict.  Subsection (d)(3)(A)(vi) and the TMA authorize the Secretary to make an adjustment to the federal rate and § (d)(5)(I)(i) also permits the Secretary to make adjustments.") (emphasis by the district court).)  In a footnote, the district court further explained, "the Secretary's application of § (d)(5)(I)(i) to the hospital-specific rate *does not impact* the adjustment to the federal rate in § (d)(3)(A)(vi) and the TMA."  (*Id*. at 15 n.12 (emphasis added).)

The district court's explanation in footnote 12 exposes its fatal error.  The TMA here required the Secretary to adjust the *standardized amount* to offset the increase or decrease in "aggregate payments," necessarily including all payments made under § 1395ww(d): All payments made to hospitals paid under *both* the standardized amount and hospital-specific rate.  That is to say, the TMA shifted the recovery of higher payments made in 2008 and 2009 entirely to hospitals paid according to the federal rate in 2011 and 2012.

Hence, contrary to the district court's conclusion, the Secretary's adjustment of the hospital-specific rate had a direct impact on the standardized amount: It *reduced* the adjustment that would otherwise have been made to the standardized amount.  Because of that impact, the Secretary's invocation of the general authority of § 1395ww(d)(5)(I)(i) to adjust the hospital-specific rate creates a conflict with

31

§ 1395ww(d)(3)(A)(vi) and the TMA.   The specific enactments of Congress, § 1395ww(d)(3)(A)(vi) and the TMA, therefore, prevail over the more general, § 1395ww(d)(5)(I)(i).  *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012) ("[T]he [general/specific] canon has full application as well to statutes such as the one here, in which a general authorization and a more limited, specific authorization exist side-by-side.  There the canon avoids not contradiction but the superfluity of a specific provision that is swallowed by the general one, violat[ing] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute. . . . The terms of the specific authorization must be complied with.") (citation and internal quotation marks omitted).

Of course, whether the TMA's instruction to offset overpayments in 2008 and 2009 exclusively by adjusting the standardized amount in 2011 and 2012 is sound as a matter of public policy is beside the point for purposes of this Court's consideration.   What matters here is that, for better or worse, Congress has specifically directed that the Secretary offset unwarranted payments from 2008 and 2009 in that manner, and the Secretary has defied that instruction.   Under *Chevron* step-one, the Secretary's action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" in violation of 5 U.S.C. § 706(2)(C), and arbitrary, capricious, and not accordance with law in violation of 5 U.S.C. § 706(2)(A).

**C.**     **The American Taxpayer Relief Act Confirms That the Secretary's Adjustment of the Hospital-Specific Rate Is Unlawful**

In the American Taxpayer Relief Act of 2012, Congress (once again) instructed the Secretary on how to effect an offset for increased payments in 2008 and 2009 (and later years) resulting from coding practices.  Congress specifically instructed the Secretary to "fully offset . . . the increase in aggregate payments from fiscal years 2008 through 2013" by making an "adjustment to the standardized amounts."  Pub. L. 112-240, § 631(b)(2)(ii), 126 Stat. 2,313, 2,353 (2013) (emphasis added).

In addition, Congress "clarified" that the Congress's instructions in the TMA are the only means by which the Secretary has authority to recoup higher coding costs incurred in fiscal years 2008 and 2009:

> CLARIFICATION.—Effective on the date of the enactment of this section, except as provided in section 7(b)(1)(B)(ii) of the TMA, Abstinence Education, and QI Programs Extension Act of 2007, as added by subsection (b)(2)(A)(ii)(IV) of this section, the Secretary of Health and Human Services *shall not have authority to fully recoup past overpayments related to documentation and coding changes from fiscal years 2008 and 2009.*

*Id.* § 631(a)(2) (emphasis added).  This "clarification"—although as demonstrated above, none was necessary under the general/specific canon—entirely forecloses the Secretary's argument, and the district court's holding, that the Secretary possesses general authority under § 1395ww(d)(5)(I)(i) to adjust hospital-specific

rates to offset overpayments from 2008 and 2009. *See Red Lion Broadcasting Co.*

*v. FCC*, 395 U.S. 367, 380–81 (1968) ("[S]ubsequent legislation declaring the

intent of an earlier statute is entitled to great weight in statutory construction.");

*see also Loving v. United States*, 517 U.S. 748, 770 (1996) (giving "great weight"

to 1985 clarification to 1950 statute).

### D.    Appellants' Construction of § 1395ww(d)(3)(A)(vi) and the TMA Is Consistent With Congress' Objective of Treating the Hospital-Specific Rate Differently from the Standardized Amount

Appellant's construction above is consistent with Congress' decision—

expressed repeatedly, and reinforced by the Secretary on numerous occasions—to

have the hospital-specific rate and standardized amount serve different purposes

and be calculated differently.

The hospital-specific rate is conceptually distinct from the standardized

amount. The hospital-specific rate is intended to reflect and memorialize each

eligible hospital's costs in a base year.[7] The standardized amount is something

different. It does not purport to be a hospital's actual costs: rather, it is based on

---

[7] Medicare regulations explain that the hospital-specific rate for hospitals with a 2006 base year is derived from costs in that base year. *See* 42 C.F.R. § 412.78 ("[F]or each hospital eligible . . . the intermediary determines the hospital's Medicare Part A allowable inpatient operating costs . . . for the 12-month or longer cost reporting period ending on or after September 30, 2006, and before September 30, 2007, and computes the hospital-specific rate for purposes of determining prospective payment rates . . . ."). Medicare regulations provide nearly identical instructions for hospitals using alternative base years.

"per discharge averages of adjusted hospital costs from a base period . . . updated and otherwise adjusted in accordance with the provisions of section [1395ww(d)]." 77 Fed. Reg. at 28,137. This "standardized amount" was derived from information gathered in 1983, and is simply carried forward with multiple adjustments being made each year. It is not required to be, and does not purport to be, the actual costs of a particular hospital in a particular year.

Given this distinction, it is entirely understandable that Congress would apply the documentation and coding adjustment squarely to the standardized amount, and not to the target amount that comprises the hospital-specific rate. If the documentation and coding adjustment were to be applied to the target amount, the target amount would no longer reflect the hospital's actual costs.

The very purpose of the regime Congress established for Qualifying Rural Hospitals is to compare payments under the standardized amount against payments based on the hospital's costs, and to pay the hospital whichever yields the higher payment. For this reason, Congress has repeatedly instructed the Secretary to make adjustments to the standardized amount without adjusting the hospital-specific rate; in each instance but this one, the Secretary complied.

The district court's construction fails to recognize the fact that Congress wanted Qualifying Rural Hospitals to have the benefit of their own historical costs as a payment rate. Applying the documentation and coding adjustment to that rate

35

would deprive them of that benefit.  As such, the district court erred in speculating that Congress could not have intended the very result that its language commanded.

## CONCLUSION

For the reasons provided above, this Court should reverse the district court's dismissal, grant Appellants' summary judgment motion, and remand with instructions to enter judgment in favor of Appellants.

Dated:  March 5, 2013                    Respectfully submitted,


                                         　/s/ Ankur J. Goel
                                         Ankur J. Goel
                                         M. Miller Baker
                                         Johnny H. Walker
                                         MCDERMOTT WILL & EMERY LLP
                                         500 North Capitol Street, N.W.
                                         Washington, DC 20001
                                         Telephone:  202.756.8000
                                         Facsimile:   202.756.8087

                                         *Attorneys for Appellants*

# STATUTORY ADDENDUM

# STATUTORY ADDENDUM

## CONTENTS

*Page*

Excerpts from Title 42, Subsection 1395ww(d) of the United States Code .......... 2a

TMA, Abstinence Education and QI Programs Extension Act of 2007,
    Pub L. 110-90, § 7, 121 Stat. 984, 986–87 (2007)........................................... 5a

American Taxpayer Relief Act of 2012,
    Pub. L. 112-240, § 631, 126 Stat. 2,313, 2,353–54 (2013)............................. 7a

# EXCERPTS FROM UNITED STATES CODE
## TITLE 42, SUBSECTION 1395ww(d)

**(d)    Inpatient hospital service payments on basis of prospective rates; Medicare Geographical Classification Review Board**

\*        \*        \*

**(3)**

**(A) Updating previous standardized amounts.—**

\*        \*        \*

**(vi)** Insofar as the Secretary determines that the adjustments under paragraph (4)(C)(i) for a previous fiscal year (or estimates that such adjustments for a future fiscal year) did (or are likely to) result in a change in aggregate payments under this subsection during the fiscal year that are a result of changes in the coding or classification of discharges that do not reflect real changes in case mix, the Secretary may adjust the average standardized amounts computed under this paragraph for subsequent fiscal years so as to eliminate the effect of such coding or classification changes.

\*        \*        \*

**(4)**

**(A)** The Secretary shall establish a classification of inpatient hospital discharges by diagnosis-related groups and a methodology for classifying specific hospital discharges within these groups.

**(B)** For each such diagnosis-related group the Secretary shall assign an appropriate weighting factor which reflects the relative hospital resources used with respect to discharges classified within that group compared to discharges classified within other groups.

**(C)**

**(i)** The Secretary shall adjust the classifications and weighting factors established under subparagraphs (A) and (B), for discharges in fiscal year 1988 and at least annually thereafter, to reflect changes in treatment patterns, technology (including a new medical service or technology under paragraph (5)(K)), and other factors which may change the relative use of hospital resources.

\*        \*        \*

**(iii)** Any such adjustment under clause (i) for discharges in a fiscal year (beginning with fiscal year 1991) shall be made in a manner that assures that the aggregate payments under this subsection for discharges in the fiscal year are not greater or less than those that would have been made for discharges in the year without such adjustment.

\*        \*        \*

**(5)**

\*    \*    \*

**(D)**
**(i)** For any cost reporting period beginning on or after April 1, 1990, with respect to a subsection (d) hospital which is a sole community hospital, payment under paragraph (1)(A) shall be—
(I) an amount based on 100 percent of the hospital's target amount for the cost reporting period, as defined in subsection (b)(3)(C) of this section, or
(II) the amount determined under paragraph (1)(A)(iii),
whichever results in greater payment to the hospital.

\*    \*    \*

(iii) For purposes of this subchapter, the term "sole community hospital" means any hospital—
(I) that the Secretary determines is located more than 35 road miles from another hospital,
(II) that, by reason of factors such as the time required for an individual to travel to the nearest alternative source of appropriate inpatient care (in accordance with standards promulgated by the Secretary), location, weather conditions, travel conditions, or absence of other like hospitals (as determined by the Secretary), is the sole source of inpatient hospital services reasonably available to individuals in a geographic area who are entitled to benefits under part A of this subchapter, or
(III) that is located in a rural area and designated by the Secretary as an essential access community hospital under section 1395i–4 (i)(1) of this title as in effect on September 30, 1997.

\*    \*    \*

**(G)**
**(i)** For any cost reporting period beginning on or after April 1, 1990, and before October 1, 1994, or discharges occurring on or after October 1, 1997, and before October 1, 2013, in the case of a subsection (d) hospital which is a medicare-dependent, small rural hospital, payment under paragraph (1)(A) shall be equal to the sum of the amount determined under clause (ii) and the amount determined under paragraph (1)(A)(iii).
**(ii)** The amount determined under this clause is—

\*    \*    \*

**(II)** for discharges occurring during any subsequent cost reporting period (or portion thereof) and before October 1, 1994, or discharges occurring on or after October 1, 1997, and before October 1, 2013, 50 percent (or 75 percent in the case of discharges occurring on or after October 1, 2006) of the amount by which the hospital's target amount for the cost reporting period or for discharges in the fiscal

year (as defined in subsection (b)(3)(D) of this section) exceeds the amount determined under paragraph (1)(A)(iii).

* * *

**(iv)** The term "medicare-dependent, small rural hospital" means, with respect to any cost reporting period to which clause (i) applies, any hospital—

**(I)** located in a rural area,

**(II)** that has not more than 100 beds,

**(III)** that is not classified as a sole community hospital under subparagraph (D), and

**(IV)** for which not less than 60 percent of its inpatient days or discharges during the cost reporting period beginning in fiscal year 1987, or two of the three most recently audited cost reporting periods for which the Secretary has a settled cost report, were attributable to inpatients entitled to benefits under part A of this subchapter.

* * *

**(I)**

**(i)** The Secretary shall provide by regulation for such other exceptions and adjustments to such payment amounts under this subsection as the Secretary deems appropriate.

**TMA, ABSTINENCE EDUCATION AND
QI PROGRAMS EXTENSION ACT OF 2007
PUB L. 110-90, § 7, 121 STAT. 984, 986–87 (2007)**

**SEC. 7. LIMITATION ON IMPLEMENTATION FOR FISCAL YEARS 2008 AND 2009 OF A PROSPECTIVE DOCUMENTATION AND CODING ADJUSTMENT IN RESPONSE TO THE IMPLEMENTATION OF THE MEDICARE SEVERITY DIAGNOSIS RELATED GROUP (MS-DRG) SYSTEM UNDER THE MEDICARE PROSPECTIVE PAYMENT SYSTEM FOR INPATIENT HOSPITAL SERVICES.**

(a) IN GENERAL.—In implementing the final rule published on August 22, 2007, on pages 47130 through 48175 of volume 72 of the Federal Register, the Secretary of Health and Human Services (in this section referred to as the 'Secretary') shall apply prospective documentation and coding adjustments (made in response to the implementation of a Medicare Severity Diagnosis Related Group (MS-DRG) system under the hospital inpatient prospective payment system under section 1886(d) of the Social Security Act (42 U.S.C. 1395ww(d)) of—

(1) for discharges occurring during fiscal year 2008, 0.6 percent rather than the 1.2 percent specified in such final rule; and

(2) for discharges occurring during fiscal year 2009, 0.9 percent rather than the 1.8 percent specified in such final rule.

(b) SUBSEQUENT ADJUSTMENTS.—

(1) IN GENERAL.—Notwithstanding any other provision of law, if the Secretary determines that implementation of such Medicare Severity Diagnosis Related Group (MS-DRG) system resulted in changes in coding and classification that did not reflect real changes in case mix under section 1886(d) of the Social Security Act (42 U.S.C. 1395ww(d)) for discharges occurring during fiscal year 2008 or 2009 that are different than the prospective documentation and coding adjustments applied under subsection (a), the Secretary shall—

(A) make an appropriate adjustment under paragraph (3)(A)(vi) of such section 1886(d); and

(B) make an additional adjustment to the standardized amounts under such section 1886(d) for discharges occurring only during fiscal years 2010, 2011, and 2012 to offset the estimated amount of the increase or decrease in aggregate payments (including interest as determined by the Secretary) determined, based upon a retrospective evaluation of claims data submitted under such Medicare Severity Diagnosis Related Group (MS-DRG) system, by the Secretary with respect to discharges occurring during fiscal years 2008 and 2009.

(2) REQUIREMENT.—Any adjustment under paragraph (1)(B) shall reflect the difference between the amount the Secretary estimates that implementation of such Medicare Severity Diagnosis Related Group (MS-DRG) system resulted in changes in coding and classification that did not reflect real changes in case mix and the prospective documentation and coding adjustments applied under subsection (a). An adjustment made under paragraph (1)(B) for discharges occurring in a year shall not be included in the determination of standardized amounts for discharges occurring in a subsequent year.

(3) RULE OF CONSTRUCTION.—Nothing in this section shall be construed as—

(A) requiring the Secretary to adjust the average standardized amounts under paragraph (3)(A)(vi) of such section 1886(d) other than as provided under this section; or

(B) providing authority to apply the adjustment under paragraph (1)(B) other than for discharges occurring during fiscal years 2010, 2011, and 2012.

(4) JUDICIAL REVIEW.—There shall be no administrative or judicial review under section 1878 of the Social Security Act (42 U.S.C. 1395oo) or otherwise of any determination or adjustments made under this subsection.

## AMERICAN TAXPAYER RELIEF ACT OF 2012,
## PUB. L. 112-240, § 631, 126 STAT. 2,313, 2,353–54 (2013)

### SEC. 631. IPPS DOCUMENTATION AND CODING ADJUSTMENT FOR IMPLEMENTATION OF MS-DRGS

(a) RULE OF CONSTRUCTION AND CLARIFICATION.—

(1) RULE OF CONSTRUCTION.—Nothing in the amendments made by subsection (b) shall be construed as changing the existing authority under section 1886(d) of the Social Security Act (42 U.S.C. 1395ww(d)) to make prospective documentation and coding adjustments to the standardized amounts under such section 1886(d) to correct for changes in the coding or classification of discharges that do not reflect real changes in the case mix.

(2) CLARIFICATION.—Effective on the date of the enactment of this section, except as provided in section 7(b)(1)(B)(ii) of the TMA, Abstinence Education, and QI Programs Extension Act of 2007, as added by subsection (b)(2)(A)(ii)(IV) of this section, the Secretary of Health and Human Services shall not have authority to fully recoup past overpayments related to documentation and coding changes from fiscal years 2008 and 2009.

(b) ADJUSTMENT.—Section 7 of the TMA, Abstinence Education, and QI Programs Extension Act of 2007 (Public Law 110–90; 121 Stat. 986) is amended—

(1) in the heading, by striking "**LIMITATION**" and all that follows through "**ADJUSTMENT**" and inserting "**DOCUMENTATION AND CODING ADJUSTMENTS**"; and

(2) in subsection (b)—

(A) in paragraph (1)—

(i) in the matter before subparagraph (A)—

(I) by striking "or 2009" and inserting ", 2009, or 2010"; and

(II) by inserting "or otherwise applied for such year" after "applied under subsection (a)"; and

(ii) in subparagraph (B)—

(I) by inserting "(i)" after "(B)";

(II) by striking "or decrease";

(III) by striking the period at the end and inserting "; and"; and

(IV) by adding at the end the following:

"(ii) make an additional adjustment to the standardized amounts under such section 1886(d) based upon the Secretary's estimates for discharges occurring only during fiscal years 2014, 2015, 2016, and 2017 to fully offset $11,000,000,000 (which represents the amount of the increase in aggregate payments from fiscal

years 2008 through 2013 for which an adjustment was not previously applied).''; and

(B) in paragraph (3)—

(i) in subparagraph (A), by inserting before the semicolon the following: ''or affecting the Secretary's authority under such paragraph to apply a prospective adjustment to offset aggregate additional payments related to documentation and coding improvements made with respect to discharges during fiscal year 2010''; and

(ii) in subparagraph (B), by striking ''and 2012'' and inserting ''2012, 2014, 2015, 2016, and 2017''.

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Cir. R. 32(a)(1), the undersigned certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this corrected brief contains <u>8,140</u> words, as calculated by Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2003 in 14-point Times New Roman.

Dated:  March 5, 2013                    /s/ M. Miller Baker
                                         M. Miller Baker

                                         *Counsel for Appellants*
                                         *Adirondack Medical Center, et al.*

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2013, I served this **Appellants' Corrected**

**Brief** by electronically filing it with the Clerk of the Court using the ECF system,

which will send notification of such filing to all ECF participants, including:


DOJ Appellate Counsel
UNITED STATES DEPARTMENT
  OF JUSTICE, CIVIL DIVISION
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

*Attorney for Appellee*



  /s/ M. Miller Baker
M. Miller Baker
McDERMOTT WILL & EMERY LLP